IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01032-NYW

CHRISTOPHER MCGRAW,

    Plaintiff,

v.

COBRA TRUCKING, INC., and
MICHAEL THIBODEAU,

    Defendants.

## ORDER ON MOTION TO STRIKE

Magistrate Judge Nina Y. Wang

This matter is before the court on Defendants Cobra Trucking Incorporated ("Cobra") and Michael Thibodeau's ("Mr. Thibodeau") (collectively, "Defendants") Motion to Strike Proposed Expert Testimony of Mark Guilford ("Motion to Strike" or the "Motion") [Doc. 44, filed August 20, 2021]. The undersigned Magistrate Judge fully presides over this matter pursuant to the Parties' consent [Doc. 21] and the Order of Reference [Doc. 22] dated June 3, 2021. The court has reviewed the Motion to Strike and the Parties' respective briefing, the docket, and applicable case law and finds that an evidentiary hearing will not materially assist in the resolution of the Motion. For the reasons set forth below, I respectfully **DENY** the Motion to Strike.

## BACKGROUND

The following facts are drawn from the docket, including the operative Complaint [Doc. 6], and are taken as true for the purposes of this Motion. On March 11, 2020, Plaintiff Christopher McGraw ("Plaintiff" or "Mr. McGraw") initiated this action in Boulder County District Court against Defendants. *See* [Doc. 6]. Mr. McGraw asserts claims for negligence and negligence per

se against Mr. Thibodeau and a claim for vicarious liability against Cobra, Mr. Thibodeau's employer, stemming from a multi-vehicle collision on July 13, 2017 in which Mr. McGraw was seriously injured. [*Id.* at ¶¶ 27–42]. Mr. McGraw claims that, in the course and scope of Mr. Thibodeau's employment with Cobra, Mr. Thibodeau caused Mr. McGraw's injuries when Mr. Thibodeau operated a semi-tractor negligently and in violation of Colorado law. *See generally* [*id.*]. Mr. McGraw alleges he "suffered serious physical injuries, including, but not limited to, a cervical vertebra fracture, a carotid artery dissection, a head injury, [and] a right elbow laceration, among other injuries." [*Id*. at ¶ 21]. Mr. McGraw also alleges that his injuries from the collision required "numerous medical procedures," which have thus far exceeded $115,000, and that he will continue to incur medical expenses in the future. *See* [*id*. at ¶¶ 21, 25]. Mr. McGraw seeks damages from Defendants, including costs for his past and future medical expenses. *See* [*id.* at 5]. On April 10, 2020, Defendants removed this action to the United States District Court for the District of Colorado. [Doc. 1].

Relevant here, Mr. McGraw designated Mark Guilford ("Mr. Guilford") as an expert witness in this case. *See* [Doc. 45 at 2]. Mr. McGraw retained Mr. Guilford to offer a medical-bill analysis of whether "Plaintiff's past medical bills were usual, customary, and reasonable"; and to "offer an opinion on the reasonable costs of Plaintiff's future medical care as recommended by Plaintiff's medical doctors." [Doc. 45 at 2]. On August 20, 2021, Defendants filed the instant Motion to Strike the proposed testimony of Mr. Guilford on the basis that Mr. Guilford's "opinions and methodology are unreliable and will only confuse and mislead the jury." [Doc. 44 at 1].

***Expert Report.*** Defendants attach Mr. Guilford's expert report ("Report") to their Motion as Exhibit A. [Doc. 44-1]. In the Report, Mr. Guilford states that he "analyzed the reasonableness of billed charges for the medical bills received by Chris McGraw" and "[t]he reasonable value of

Mr. McGraw's bills was given in the vicinity of Denver, CO." [*Id*. at 1]. Mr. Guilford explains that his report "relies on the medical billing and procedural codes that appear on the medical bills to pull historical billed charges from providers from … databases of the same or similar procedures." [*Id.*]. With respect to the costs for Plaintiff's future medical care, Mr. Guilford states there is a "Future Needs" report that "provides a full estimate of the reasonable value of billed charges for the treatment and procedures recommended by Frederic Sonstein, MD," a doctor who performed Plaintiff's "Neurosurgical IME dated August 25, 2020." [*Id.*]. Additionally, "the Future Needs report assumes the treatment would be done in the vicinity of Denver, CO." [*Id.*]. Mr. Guilford explains further that his report "replies on the recommendations by Dr. Sonstein to pull historical billed charges from the databases of the same or similar procedures, as well as, determine the billing codes and associated charges of the other medical services that will likely be provided at the time of the treatment." [*Id.*].

As to his qualifications, Mr. Guilford states that, in compiling his exhibits, he relied on his "background in reviewing and analyzing medical bills and in financial valuation and data analytics." [*Id*. at 2]. Specifically, Mr. Guilford explains that he is the CEO of AccuMed HealthCare Research ("AccuMed"), a "healthcare data analytics company that specializes in transparency of healthcare billed charges." [*Id*. at 2]. In his role as CEO, Mr. Guilford is "responsible for all day-to-day operations[,] including data aggregation, analysis methodologies and assumptions, and product development." *See* [Doc. 45-1 at 1]. Moreover, AccuMed "maintains a database of over 1.1 million providers located throughout the United States" and "[t]he database contains providers' actual charges for approximately 6.7 billion patient encounters; representing five trillion dollars in billed medical services." [Doc. 44-1 at 2].

*Methodologies.* Mr. Guilford also describes his methodologies, stating that his analysis "is a comparison of billed amounts for a typical patient receiving similar care in a specific geographic region and at a specific point in time." [*Id*. at 2]. Mr. Guilford states that he does "not make independent assumptions, nor do[es] he opine on a patient's current state of health, diagnosis, or prognosis." [*Id.*]. Rather, Mr. Guilford relies "on bills, medical records, and other documents generated in connection with [the] patient's treatment." [*Id.*]. Additionally, Mr. Guilford compares the patient's bills "to an amount that includes a significant percentage of procedures performed by similar providers." [*Id.*]. A "significant percentage," Mr. Guilford explains, "includes 8 out of 10 procedures (or the 80th percentile)" ("80th Percentile method"). [*Id*.]. According to Mr. Guilford, "[t]he 80th [P]ercentile method is a broadly accepted method utilized by experts in [his] field, as well as, in the healthcare industry to determine a 'usual and customary' amount between two uncontracted parties, such as a patient and a provider." [*Id*.]. As to his analysis of medical bills, Mr. Guilford states "[t]he analysis of billed charges for professional providers, durable medical equipment, ambulatory surgery centers, and diagnostic testing facilities is done by searching historical databases for each occurrence of a CPT/HCPCS code billed by similar providers. The data is then filtered to include only providers within a preset radius around a designated location." [*Id*.]. Mr. Guilford's report continues:

> In certain situations, local data is unavailable for a specific procedure (e.g. due to its rarity, the remoteness of the patient, etc.). In these cases, the radius for that code is enlarged until sufficient data is available. If a national sample is pulled, a geographic adjustment factor is applied to make it geographically relevant. It then calculates the 80th percentile to return a value reflecting the prevailing charges for that region. Determining the 80th percentile of hospital charges is done in a similar manner except the hospital database is filtered based on DRG codes and PR codes instead of CPT/HCPCS codes.

[*Id*. at 2–3].

*Affidavit.* Mr. Guilford also submitted an affidavit [Doc. 45-8] wherein he summarizes his background in data analytics and his work at AccuMed, [*id*. at ¶¶ 3–5], and states that "AccuMed's database is comprised of **publicly disclosed data sets**," [*id*. at ¶ 7 (emphasis in original)]. Mr. Guilford explains that "[a]ll data is publicly available, the vast majority of which is sourced from the Federal government" and "Defendant or any other party that has adequate expertise and technological capabilities … can access the data I use in these analyses and, following the methodologies outlined in my opinion and working file, arrive at the same conclusions." [*Id*. at ¶ 7]; *see also* [*id*. at ¶ 9 (identifying the "sources of [Mr. Guilford's] data")]. As to his qualifications, Mr. Guilford further explains that prior to his work at AccuMed, Mr. Guilford performed "the valuation of assets, services, and products" in the investment-banking industry. [*Id.* at ¶ 10]. He states that "[t]he entirety of [his] 18-year career has centered around statistics and the financial valuation of assets and services through the use of data analytics." [*Id.*]. Finally, Mr. Guilford indicates that he learned the "techniques and methods regarding valuation and data analytics" while earning his finance degree at the University of Colorado. [*Id.* at ¶ 11]; *see also* [Doc. 45-1 at 2].

*Motion to Strike.* In the Motion to Strike, Defendants argue that (1) "Mr. Guilford's opinions and methodology are unreliable because he subjectively modifies his data sets and search criteria without disclosing this manipulation," [Doc. 44 at 4]; (2) Mr. Guilford's opinion "would only serve to confuse and mislead the jury to allow Mr. Guilford to falsely represent to the jury that his opinions are statistically valid," [*id*. at 8]; and (3) "Mr. Guilford failed to disclose not only which providers he excluded from his analysis, but also how he chose which providers to exclude" and "Mr. Guilford failed to disclose how he decided whether the data from any particular year was sufficient for his analysis," [*id.*].

In his Response [Doc. 45, filed September 10, 2021], Mr. McGraw contends that Defendants' Motion should be denied because "Mr. Guilford's opinions are supported by reliable methodology." [Doc. 45 at 3]. Mr. McGraw also asserts that Mr. Guilford is sufficiently qualified under Fed. R. Evid. 702; Mr. Guilford's methodology was reliably applied to the facts of this case; Mr. Guilford's testimony is based on sufficient facts and data; Mr. Guilford's testimony will help the trier of fact determine Plaintiff's past and future medical bills; Mr. Guilford disclosed the providers and databases that are used in his analysis; Mr. Guilford's testimony should not be excluded under Fed. R. Evid. 403; and Plaintiff disclosed all the information necessary for Defendants to recreate and test Mr. Guilford's opinion. *See* [Doc. 45 at 6–14]. Additionally, Mr. McGraw points out that "Defendants have not retained an expert in medical billing or medical bill valuation and present no expert testimony to support their arguments." [*Id*. at 2].

## LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence permits:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As noted by the Advisory Committee when the Rule was promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee's note to 1937 rule.

It is well established that trial courts are charged with the responsibility of acting as gatekeepers of expert testimony to ensure that expert testimony or evidence admitted is not only relevant, but also reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–152 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588–89 (1993). To fulfill that gatekeeper function, courts within the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") conduct a two-part inquiry. First, this court considers whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by conducting a preliminary inquiry into the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citing *Butler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2004)). Second, the court considers whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder. *See id.* The party offering the expert opinion bears the burden of establishing its admissibility, including the foundational requirements by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.* The court's analysis is opinion-centric, rather than expert-centric. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1251 (D. Colo. 2009).

## ANALYSIS

**I.      Rule 702 Hearing**

Before turning to the substantive analysis of Defendants' Motion to Strike, this court first briefly addresses whether an evidentiary hearing is necessary to address the Parties' respective arguments. Rule 702 of the Federal Rules of Evidence does not specify a process by which admissibility of expert opinions is to be determined. *See Nacchio*, 608 F. Supp. 2d at 1251. Instead, Rule 104 of the Federal Rules of Evidence requires a hearing on preliminary questions of admissibility in civil cases "when justice so requires." Fed. R. Evid. 104(c)(3). A trial court is authorized to exercise its discretion to craft a procedure for determining whether opinion testimony is admissible. *See Adamscheck v. Am. Fam. Mut. Ins. Co.*, 818 F.3d 576, 586 (10th Cir. 2016) (observing that the trial court has discretion in how to conduct a *Daubert* analysis); *Nacchio*, 608 F. Supp. 2d at 1255 (same). Thus, "while a party may request a *Daubert* hearing, it is within the Court's discretion to determine whether a hearing is necessary." *A.R. by Pacetti v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, No. 12-cv-02197-RM-KLM, 2013 WL 5463518, at *10 (D. Colo. Sept. 30, 2013).

In applying these principles, this court finds that an evidentiary hearing will not materially assist in resolving the Motion. First, neither party addresses a specific need for an evidentiary hearing. Indeed, Defendants do not request an evidentiary hearing their Motion. [Doc. 44]. And while Mr. McGraw cursorily makes a request for an evidentiary hearing, *see* [Doc. 45 at 3], the Response does not articulate a basis for such hearing apart from "the potentially complex nature of medical billing analysis," [*id*.]. Upon review of the Parties' submissions and the applicable case law, this court finds that it can appropriately discharge its gatekeeping functions without such

hearing and make the requisite findings based upon the written record before the court. I now turn to considering the Motion to Strike substantively.

## II.  Motion to Exclude Mr. Guilford's Opinions

Defendants argue that Mr. Guilford's opinion should be excluded because (1) "Mr. Guilford's opinions and methodology are unreliable because he subjectively modifies his data sets and search criteria without disclosing this manipulation," [Doc. 44 at 4]; (2) Mr. Guilford's opinion "would only serve to confuse and mislead the jury to allow Mr. Guilford to falsely represent to the jury that his opinions are statistically valid," [*id*. at 8]; and (3) "Mr. Guilford failed to disclose not only which providers he excluded from his analysis, but also how he chose which providers to exclude" and "Mr. Guilford failed to disclose how he decided whether the data from any particular year was sufficient for his analysis," [*id.*].

As mentioned above, this court must first consider the following: (1) whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by conducting a preliminary inquiry into the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid; and (2) whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder. *See Cook*, 580 F. Supp. 2d at 1082. I consider these issues in reverse order.

First, I find that the proposed testimony here is sufficiently relevant to the issues presented to the factfinder. Mr. McGraw alleges he has "suffered serious physical injuries" and required "numerous medical procedures," which have thus far exceeded $115,000, and that he will continue to incur medical expenses in the future. *See* [Doc. 6 at ¶¶ 21, 25]. Mr. McGraw seeks damages from Defendants, including costs for his past and future medical expenses. *See* [*id.* at 5]. Mr. McGraw in turn retained Mr. Guilford to offer a medical-bill analysis of whether "Plaintiff's past

medical bills were usual, customary, and reasonable"; and to "offer an opinion on the reasonable costs of Plaintiff's future medical care as recommended by Plaintiff's medical doctors." [Doc. 45 at 2]. Moreover, Defendants do not argue that Mr. Guilford's testimony lacks relevance to the issues in this case. Rather, they argue that Mr. Guilford's opinion is unreliable. *See generally* [Doc. 44; Doc. 46]. Accordingly, there is no dispute that Mr. Guilford's proposed testimony is sufficiently relevant to the issues in this case.

Second, Defendants do not challenge Mr. Guilford's qualifications. *See* [Doc. 44]. In his Response, Plaintiff contends that "Mr. Guilford is sufficiently qualified under Fed. R. of Evid. 702 to offer testimony and opinions on the reasonableness of Plaintiff's past medical bills and the reasonable cost of Plaintiff's proposed future treatment." [Doc. 45 at 6]. Plaintiff also cites to this court's opinion in *Jones v. State Farm Mut. Auto. Ins. Co.*, No. 19-cv-01873-NYW, 2021 WL 3625435 (D. Colo. Apr. 27, 2021) to support his argument that Mr. Guilford is so qualified. [*Id*.]. In *Jones*, Mr. Guilford was retained as an expert witness "to rebut the testimony of State Farm's expert on medical billing," who "had determined in her expert report that [the plaintiff's] submitted medical billing charges were not customary or reasonable." *Jones*, 2021 WL 3625435, at *3. This court reviewed Mr. Guilford's credentials and concluded that Mr. Guilford was qualified to render his opinion:

> The court finds that Mr. Guilford's background in valuation and statistical analysis, coupled with his experience serving as AccuMed's CEO – through which he has learned and studied medical-billing coding – supports a finding that Mr. Guilford is qualified to render a medical-billing opinion.

*Id*. at *8. Similarly here, Plaintiff has retained Mr. Guilford to evaluate the reasonableness of Plaintiff's past and future costs for medical care. *See* [Doc. 45 at 2 (stating Plaintiff retained Mr. Guilford "as an expert in medical billing analytics to assess whether Plaintiff's past medical bills were usual, customary, and reasonable" and "Mr. Guilford will also offer an opinion on the

10

reasonable costs of Plaintiff's future care as recommended by Plaintiff's medical doctors")]. Accordingly, the court finds that Mr. Guilford is similarly qualified to render a medical-billing opinion here.

*Methodology and Reliability.* Related to Mr. Guilford's qualifications, the court must determine whether Mr. Guilford's opinions are reliable here. "Typically, to determine the reliability of expert testimony, courts do not focus on the correctness of the opinion; rather, the proponent of the expert must prove that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, No. 10-cv-02271-PAB-BNB, 2012 WL 5249459, at *5 (D. Colo. Oct. 24, 2012) (internal quotation omitted). Where, such as here, an expert's testimony is based on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, Advisory Committee Notes). Indeed, the Advisory Committee Notes provide that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702, Advisory Committee Notes. "It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant." *Chateau Vill. N. Condo. Ass'n v. Am. Fam. Mut. Ins. Co.*, No. 14-cv-01583-PAB-NYW, 2016 WL 1444626, at *1 (D. Colo. Apr. 13, 2016).

Given these principles, courts in this District have noted that "[u]sually, it is necessary for the opponent of the opinion to call its own witness to establish, for example, that the proponent's

11

methodology is not generally recognized in the field, that it has inherent false, [or] that it was not properly applied." *A-W Land Co., LLC v. Anadarko E&P Co.,* LP, No. 09-cv-02293-MSK-MJW, 2017 WL 4161278 (D. Colo. Sept. 20, 2017).

Here, Defendants do not call their own expert witness to rebut Mr. Guilford's opinion. Rather, Defendants argue that Mr. Guilford's opinions and methodology are unreliable because he "subjectively modifies his data sets and search criteria without disclosing this manipulation." [Doc. 44 at 4]. Specifically, Defendants argue that "Mr. Guilford fails to disclose his actual methodology," arguing that Mr. Guilford "fails to disclose which medical providers he excluded from his research, why he chose to exclude the providers, and how he chose which databases to search." [*Id.* at 4–5].

In his Response, Plaintiff counters that Mr. Guilford's methodology, particularly the 80th Percentile method, is reliable as it is used to "determine the usual, customary, and reasonable amount billed for a specific medical procedure within a specific geographic region at a specific time." [Doc. 45 at 6 (citation omitted)]). Plaintiff also contends that Mr. Guilford's methodology was reliably applied to the facts of this case because "[e]very medical, surgical, and diagnostic service received by Plaintiff has a specific CPT or HCPCS code that is standardized across medical providers" and Mr. Guilford searches "'historical databases for each occurrence of the CPT/HCPCS code billed by similar providers.'" [*Id*. at 8 (quoting [Doc. 44-1 at 2])]. Additionally, Plaintiff argues that Mr. Guilford disclosed (a) the providers that are included in his analysis, (b) the databases used in his analysis, and (c) all the information necessary for Defendants to recreate and test Mr. Guilford's opinion. [*Id*. at 11–14].

In the Reply [Doc. 46], Defendants reasserts the "real issue" raised in the Motion is that "Mr. Guilford deliberately excluded certain medical providers from his data set, but does not

disclose either the fact he excluded providers or his methodology for excluding providers. Therefore, Mr. Guilford's methodology is unreliable, his opinions are misleading, and his disclosure is inadequate." [Doc. 46 at ¶ 1]. Defendants also argue that *Jones* is inapplicable because it "does not address the same arguments" in the instant Motion. [*Id*. at ¶ 7]. As explained below, I respectfully disagree with Defendants that Mr. Guilford's opinion and methodology are not reliable.

First, Defendants' argument that Mr. Guilford "modifies his data sets and search criteria without disclosing his manipulation," [Doc. 44 at 4], is unavailing. Defendants primarily find issue with Mr. Guilford's narrowing of the types and locations of medical providers used in his Report. *See, e.g.*, [Doc. 44 at 4–8; Doc. 46 at ¶¶ 1–5]. For instance, Defendants argue that they "have no way to evaluate Plaintiff's data because they do not know which providers Mr. Guilford deemed 'appropriate' and which providers he excluded, or even the methodology Mr. Guilford used to exclude providers, based on the [R]eport." [Doc. 46 at ¶ 5]; *see also* [*id*. at ¶ 3 ("Mr. Guilford makes no effort to disclose this 'narrowing down' process. In his [R]eport … Mr. Guilford argues that he merely searches certain codes within certain locations.")].

Defendants' arguments, however, ignore that Mr. Guilford provided this exact information in the Report [Doc. 44-1]. For example, Mr. Guilford states that "[t]he analysis of billed charges … is done by searching historical databases for each occurrence of a CPT/HCPCS code billed by similar providers" and [t]he data is then filtered to include only providers within a preset radius around a designated location." [Doc. 44-1 at 2]. As to the specific location of his analysis, Mr. Guilford testified at his deposition that, in this instance, he drew "a 30-mile radius around Mr. McGraw's address and pull[ed] … all the providers who have billed [a certain] code." [Doc. 44-

2 at 18:7–10].[1] After receiving "a list of providers and what they charge," he then "calculate[d] the 80th percentile across all of the providers." [*Id*. at 18:16–20]. Mr. Guilford further testified that when he lacks "enough data in the locality," then he "expand[s] the radius" accordingly to obtain enough data for his analysis. [*Id*. at 18:21–25]; *see also* [Doc. 44-1 ("In certain situations, local data is unavailable for a specific procedure (e.g. due to its rarity, the remoteness of the patient, etc.). In these cases, the radius for that code is enlarged until sufficient data is available.")]. Notably, while Defendants argue in the Reply that they "have no way to evaluate Plaintiff's data because they do not know which providers Mr. Guilford deemed 'appropriate' and which providers he excluded," [Doc. 46 at ¶ 5], Defendants also cite Mr. Guilford's deposition testimony, *see* [*id*. at ¶ 2], where he offers to provide this information:

> **Q.    Okay. So from your report, there's now way for me to know which providers you determined were not appropriate or relevant providers?**
>
> …
>
> **A.    There – if it would be helpful, I could supply a list of all the providers and all the ones that aren't in the data file for a specific code.**

[Doc. 44-2 at 28:7–14]. Neither Defendants' Motion nor Reply address why Defendants have not accepted Mr. Guilford's offer to supply the list of providers.

Moreover, Defendants cite no support for their argument that Mr. Guilford was required to disclose the medical providers he *excluded* from his analysis. *See* [Doc. 44 at 4]. As to his methodology for identifying relevant providers, Mr. Guilford states further that he has "disclosed all the search parameters for each unique provider/code/date of service in [his] working file." [Doc. 45-8 at ¶ 17]; *see also* [Doc. 45-6; Doc. 45-7]. Indeed, Mr. Guilford explains that he "seek[s] the most appropriate providers and data sets to include in [his] analysis" and he does not

---

[1] Citations to deposition testimony will refer to the docket number of the filing generated by the CM/ECF filing system and then the specific page number of the deposition.

"believe it to be possible to disclose all the data sets and types of providers that are not included or considered in arriving at [his] opinions." [Doc. 45-8 at ¶ 18 (emphasis in original)]. Mr. Guilford also explains that his Report "relies on the medical billing and procedural codes that appear on [Plaintiff's] medical bills to pull historical billed charges from providers … of the same or similar procedures"; and the evaluation of Plaintiff's future medical needs are based on "the reasonable value of billed charges for the treatment and procedures recommended by" Dr. Sonstein, who performed a neurosurgical IME on Plaintiff. [Doc. 44-1 at 1]. In other words, Mr. Guilford explains that he excluded providers if they did not perform "the same or similar procedures" to those Plaintiff has either already undergone or will likely undergo in the future. *See* [*id*.]; *see also, e.g.*, [Doc. 44-2 at 30:1–20 (Mr. Guilford provides an illustration of his narrowing process as they relate to medical-billing codes: "In other cases, say, eval codes, like typical office visits, which is like a 99213 or a 91213, that's just when you go into an office and have a checkup. That's billed by most all physicians, but there is a big difference between a family medicine doctor billing that code in terms of price and a neurosurgeon billing that code. So that's when it's important – and now we're talking about something different, where there are ten times as many family medicine doctors out there as neurosurgeons. So logic would tell you family medicine doctors are going to drive that data. They're going to drive that result if they're included in the sample. But … if I'm valuing it against a neurosurgeon, it's not going to be accurate. So I am going to only search for surgeons, and find what – what similar types of providers charge for a common code.")].

The record also reflects that Dr. Guilford disclosed the databases he considered in forming his opinions. For instance, Mr. Guilford states that "AccuMed's database is comprised of **publicly disclosed data sets**," [Doc. 45-8 at ¶ 7 (emphasis in original)]. Mr. Guilford explains that "[a]ll

data is publicly available, the vast majority of which is sourced from the Federal government" and "Defendant or any other party that has adequate expertise and technological capabilities … can access the data I use in these analyses and, following the methodologies outlined in my opinion and working file, arrive at the same conclusions." [*Id*. at ¶ 7]; *see also, e.g.*, [*id*. at ¶ 9 (identifying the "sources of [Mr. Guilford's] data"); Doc. 44-1 at 2 ("AccuMed maintains a database of over 1.1 million providers located throughout the United States. The database contains providers' actual charges for approximately 6.7 billion patient encounters; representing five trillion dollars in billed medical services."); *id.* at 28 ("The data contained in this report related to hospitals is sourced from the Nationwide Inpatient Sample of the Healthcare Costs and Utilization Project (the 'HCUP NIS') and the Nationwide Emergency Department Sample (the 'HCUP NEDS'), which are sponsored by the Agency for Healthcare Research and Quality (an Agency in the US Department of Health and Human Services), bills already reviewed, or the American Hospital Directory.")].

Moreover, Defendants explicitly acknowledge that they "never raise [the issue of] … whether the 80th percentile is an adequate measure of medical expenses." [Doc. 46 at ¶ 7]. Likewise, an examination of Defendants' Motion reveals no substantive critique of the use of the 80th Percentile method as an appropriate methodology in rendering an opinion regarding the reasonableness of medical billing. [Doc. 44]. However, Defendants nevertheless find issue with Mr. Guilford's use of the 80th Percentile Method, arguing that "it is highly unlikely that Mr. Guilford's opinions truly reflect the 80th percentile" because "Mr. Guilford's data represents the 80th percentile of the charges contained in his databases only *after* he has sifted through the data and decided which medical providers should be included and which years he should search." [Doc. 44 at 8]. This argument relates to Defendants' overall position that Mr. Guilford "adjusts his

16

search criteria based on his own subjective determination of which data is most relevant." *See* [*id.* at 4]; *see also* [Doc. 46 at ¶ 4 ("Mr. Guilford's data only represents the 80th percentile of medical charges after he has subjectively removed certain providers from his analysis. This is not the 80th percentile at all.")].

Defendants' concern here appears to be more related to the manner by which Mr. Guilford relied on his knowledge, experience, and expertise to determine the appropriate search criteria for his analysis—i.e., Mr. Guilford's qualifications – and the outcome of the analysis, rather than the 80th Percentile Method as an analytic framework. But, as addressed above, Defendants do not challenge Mr. Guilford's qualifications. *See, e.g.*, [Doc. 46 at ¶ 7 (stating that *Jones v. State Farm*—where this court analyzed Mr. Guilford's qualifications—"does not address the same arguments" as those in the instant Motion to Strike)]. Thus, despite Mr. Guilford's qualifications to offer a medical-billing analysis, *see Jones*, 2021 WL 3625435, at *8, Defendants' position appears to be that Mr. Guilford lacks the qualifications to identify relevant providers and locations against which to compare Plaintiff's past and future medical expenses. *See, e.g.*, [Doc. 44 at 8 ("Rather, [Mr. Guilford] makes a subjective determination of which databases to search and which medical providers to include int eh various databases. At minimum, this provides Mr. Guilford the opportunity to pick and choose which data to include in his analysis in order to manipulate the outcome.")]. This court is unpersuaded that striking Mr. Guilford's opinions at this juncture is appropriate.

As Plaintiff points out, Defendants present no evidence or expert testimony demonstrating that Mr. Guilford's methodology was not reliably applied to the facts of this case. *See* [Doc. 45 at 9]. Moreover, while it would be insufficient for Mr. Guilford simply to rely upon "his 18 years of professional valuation experience," [Doc. 45-8 at ¶ 12], to justify his opinions, *see Clifton v. State*

17

*Farm Mut. Auto. Ins. Co.*, No. 18-cv-01231-MSK-STV, 2021 WL 1100403, at *7 (D. Colo. Mar. 23, 2021) ("[A]n articulation of qualifications is not, of itself, sufficient to carry [the proponent's] burden."), he explains that his "analysis relies on the medical billing and procedural codes that appear on the medical bills to pull historical billed charges from providers from [AccuMed's] databases of the same or similar procedures." *See* [Doc. 44-1 at 1]; *see also* [*id.* at ¶ 6 (describing AccuMed's database)]. Additionally, as discussed above, Mr. Guilford states that the 80th Percentile method "is a broadly accepted method utilized by experts in [his] field" and "also used in the healthcare industry to determine a 'usual and customary' amount between two uncontracted parties, such as a patient and a provider." [Doc. 45-8 at ¶ 21]; *see also* [*id.* at ¶¶ 22–25].

In any event, Defendants' criticisms regarding the medical providers or databases on which Mr. Guilford relied in preparing the Report suggest challenges to Mr. Guilford's data and/or assumptions, but do not address his methodology, and thus go to the weight, rather than the admissibility, of Mr. Guilford's opinions. *See Hardy v. Union Pac. R. Co.*, No. 10-CV-01880-REB-MJW, 2011 WL 5295199, at *3 (D. Colo. Nov. 2, 2011) (finding that "[t]o the extent [the expert's] facts and data … may be inaccurate, incomplete, or otherwise imperfect, those flaws go to the weight to be ascribed to his opinions, and not to their admissibility.")]. Defendants will have an opportunity to challenge the admissibility of Mr. Guilford's opinions at trial to the extent that he testifies in a manner that is inconsistent than what is presented in this briefing, and cross-examine Mr. Guilford's testimony and point out any inconsistencies or flaws.

Accordingly, this court concludes that between Mr. Guilford's Report [Doc. 44-1], his Affidavit [Doc. 45-8], his deposition testimony [Doc. 44-2], and Defendants' failure to come forth with any expert testimony to rebut the findings in the Report, *see* [Doc. 44], Mr. Guilford's opinions are sufficiently reliable to avoid preclusion at this juncture. To the extent that Defendants

conclude that Mr. Guilford's ultimate opinions are incorrect, this court notes that Plaintiff need not prove, in the context of a *Daubert* challenge, that Mr. Guilford "is [in]disputably correct or that [his] theory is 'generally accepted' in the scientific community." *Dodge*, 328 F.3d at 1222; *Two Moms & a Toy*, 2012 WL 5249459, at *5 ("[t]ypically, to determine the reliability of expert testimony, courts do not focus on the correctness of the opinion"). Because the court finds that Defendants' criticisms go to the weight, not admissibility, of Mr. Guilford's opinions, the court **DENIES** State Farm's Motion to Strike Mr. Guilford's Proposed Expert Testimony.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)   Defendant's Motion to Strike Proposed Expert Testimony of Mark Guilford [Doc. 44] is **DENIED**.

DATED:  November 1, 2021                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge